NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0606n.06

No. 08-1360

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 27, 2009**
LEONARD GREEN, Clerk

CHIAVERINI, INC.,

    **Plaintiff-Appellant**,

v.

FRENCHIE'S FINE JEWELRY, COINS
& STAMPS, INC.,

    **Defendant-Appellee.**

**ON APPEAL** FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

**O P I N I O N**

**Before: KEITH, SUTTON, and WHITE, Circuit Judges.**

**WHITE, CIRCUIT JUDGE**. Plaintiff-Appellant, Chiaverini, Inc. (Chiaverini), brought this

diversity action against Frenchie's Fine Jewelry, Coins & Stamps, Inc. (Frenchie's) alleging that

Frenchie's had purchased items that belonged to Chiaverini, that it knew or should have known were

stolen. The jury returned a verdict in favor of Frenchie's, finding that Chiaverini had not shown that

it was the rightful owner of the items. Chiaverini moved for a new trial, contending that the jury's

verdict was against the weight of the evidence, and that defense counsel had committed misconduct

by submitting inadmissible evidence to the jury. The district court denied Chiaverini's request for

relief, and this appeal followed.

I.

Frenchie's is located in Monroe, Michigan, and is owned and operated by Mary Beneteau and

her son, Brian Beneteau. From March 29 to May 30, 2001, Dennis Heams sold scrap jewelry, coins,

and precious gems to Frenchie's. Heams told Brian Beneteau the items he was selling belonged to Gail Little, and that they were being sold for the care of her father, Vito Chiaverini. Heams requested that the checks be made out to Little, and Frenchie's complied with this request. Over the course of approximately eight transactions, Frenchie's paid Little over $50,000 for jewelry, coins, and gems received from Heams.

In September 2003, Jascha Chiaverini, then the sole owner of Chiaverini, a corporation operating a pawn shop in Toledo, Ohio, visited Frenchie's seeking information about the property it purchased from Heams. Jascha believed that the items Heams sold to Frenchie's were taken by his mother, Annette Chiaverini, from his pawn shop without authorization sometime before her death on April 16, 2001. On December 16, 2004, Chiaverini filed the instant action against Frenchie's, alleging that Frenchie's violated Michigan's Precious Metals and Gem Dealers Act by failing to record Heams' driver's license and fingerprints, failing to complete the required transaction form and file it with the police, and by unlawfully converting merchandise that it knew was stolen.[1]

At trial, the parties presented testimony from Gail Little, her brother Jascha Chiaverini, two former employees of Chiaverini's pawn shop, Denny Heams, Brian Beneteau, Mary Beneateau, and a state police officer who conducted an investigation regarding the items sold by Heams to Frenchie's. The jury failed to find that Chiaverini was the "rightful owner of any of the property at issue in this case," and the district court entered judgment in favor of Frenchie's. Chiaverini filed a motion for a new trial and judgment notwithstanding the verdict, both of which the district court

---

[1]Mich. Comp. Laws § 445.484 requires dealers to keep a record of each transaction covered by the act for one year. Dealers are also required to provide a copy of the transaction form to the "appropriate policy agency or sheriff's department." The transaction form requires the name, date of birth, driver's license number, and fingerprint of the person conducting the transaction.

denied. On appeal, Chiaverini argues that it is entitled to a new trial because: (1) the jury's verdict was against the weight of the evidence, and (2) defense counsel committed misconduct by submitting inadmissible evidence to the jury.

II.

Rule 59 permits a party to request a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."[2] Fed. R. Civ. P. 59(a)(1)(A). This court has held that

> [A] new trial is warranted when a jury has reached a "seriously erroneous result" as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias.

*Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996).

This court reviews a district court's decision to deny a motion for a new trial for an abuse of discretion. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000). Accordingly, this court may only reverse such a decision if it has "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (citation and internal quotation marks omitted).

This court has explained:

> In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence. It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict

---

[2]Chiaverini's motion before the district court was a request for a "judgment n.o.v." However, it did not move for judgment as a matter of law under Rule 50 before the case was submitted to the jury. Thus, its request for a "judgment n.o.v." must be construed as a Rule 59 motion.

should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable.

*Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir. 1998) *(quoting J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 (6th Cir. 1991)).

In the instant case, the most convincing evidence that some of the items belonged to Chiaverini was the presence of "buy tags" on some of the items Gail Little gave to Denny Heams.[3] However, there was no evidence indicating which property had buy tags and which did not. In addition, the items sold included coin proof sets that were not alleged to have come from the store, and were clearly part of Annette's personal collection. No documentation establishing Chiaverini's ownership of any of the items sold to Frenchie's was provided to the jury. Finally, the jury was presented with conflicting evidence concerning ownership of the pawn shop. The jury may have found that Annette was the owner of the pawn shop until March 20, 2001, when a bill of sale was executed giving Jascha Chiaverini full ownership of the shop. The items were taken from the store before that date and the jury could have concluded that Annette was the rightful owner of the items at the time she gave them to Little. Thus, we cannot say that the trial court abused its discretion in finding that the jury's verdict was not against the weight of the evidence, and declining to grant a new trial on that basis.

Chiaverini's second ground for appeal asserts that it is entitled to a new trial based on misconduct of defense counsel. Chiaverini points to several excerpts of witness testimony that it

---

[3]Lynett Smith, Jascha's girlfriend and a pawn shop employee, testified that the pawn shop had an elaborate procedure of placing "buy tags" on all merchandise purchased by the shop. The buy tag contained a number that corresponded with a card, and the card contained information about the person who sold the item (name, driver's license number, address, birthdate), and a description of the item.

asserts were inadmissible: (1) testimony from Brian Beneteau stating that Jascha Chiaverini told him he had been in prison; (2) an improper statement by defense counsel that Jascha had been imprisoned for six years; and (3) testimony by Detective Meyer that he was unable to conclude who owned the property that was sold to Frenchie's in the Spring of 2001. Chiaverini contends that this testimony was "part of a determined effort by defense counsel to get this inadmissible evidence to prejudice the jury." As stated above, this court reviews a district court's denial of a motion for a new trial for abuse of discretion.

During the direct examination of the first witness, counsel for Chiaverini asked Brian Beneteau, one of the owners of Frenchie's, the following questions:

> **Attorney Rogers**: And do you recall when Jascha Chiaverini showed up? I guess it would have been in 2— near the end of 2003, after his father's death, with a copy of those receipts?
> **Witness Beneteau**: I recall.
> **Rogers**: And what was your conversation with Jascha at that time?
> **Beneteau**: He told us he had just gotten out of prison and that when he was in prison, his parents were ---
> **Rogers**: Your Honor, I'm going to object to one type of thing and move to strike his comment about prison.
> **The Court**: Well, he was responding to your question.
> **Meyers** (defense counsel): He asked the question and he's relaying the information supplied by his client as part of the answer.
> **The Court**: Okay.
> **Meyers**: There's no objection there.
> **The Court**: Well, it's your witness. So I guess if you want to have the question and answer withdrawn, we can grant your request to strike it. The jury will be instructed to disregard it.
> **Rogers**: Yes, your honor.
> **The Court**: Go ahead.
> **Rogers**: The—well, now that you all have been tainted—probably then continue on, Your Honor. I don't see any way the jury in a proper manner can ignore the statement. Let me go ahead and question him. So—
> **The Court**: Counsel, could you find a convenient time to break in the next—
> **Rogers**: Well, I guess this would be a convenient time to break, Your Honor, and we'll come back after lunch.

5

After lunch, Beneteau's testimony resumed:

> **Rogers**: Now, Mr. Beneteau, just as we were ending up before the break I had asked you to talk about when Jascha Chiaverini had come to visit you in late 2003, and I believe you testified he told you he had just gotten out of jail and what? Is that correct?
>
> **Witness Beneteau**: Continue?
>
> **Rogers**: Is that what he told you?
>
> **Beneteau**: He told us he had gotten out of prison. While he was in prison his parents had operated a store and when his father passed away—and I'm trying to, again, this is a long time ago, but when they were at his father's house they found receipts from our store, which are the ones, of course, you had identified, and he came in and asked us if his father had received the proceeds from these sales. And at that time we gave him the copies of the receipts that we had, we gave him copies of the checks that we had, and we also ordered more checks from the bank that we did not have that would be able to show the endorsements on the back of the checks.
>
> **Rogers**: Now, you said he had told you he had just gotten out of jail. Would it surprise you that Mr. Chiaverini has never been in jail since 1993?
>
> **Beneteau**: I'm not sure why he would have brought that up, to tell you the truth. He said he was a model prisoner.
>
> **Rogers**: So you are asking this jury to believe that ten years later he would come in and tell you he had just gotten out of jail?
>
> **Beneteau**: And told us he was a model prisoner.
>
> **Rogers**: Now, wouldn't you in fact bring up that sort of statement because you would like to assassinate the character of Jascha Chiaverini?
>
> **Beneteau**: No, sir. I brought that up because you asked me what he said when he came into the store.
>
> **Rogers**: That's what he said, and I hope the jury notes it.

Chiaverini also points to an exchange between defense counsel and Gail Little, where Little was asked if she had ever had to call the police on her brother, and she responded, "Oh, yeah. Definitely." The district court did not allow Little to testify about any of the details surrounding her previous conflict with her brother, but allowed testimony related to "the fact there [was] bad blood between the witness and her brother." Defense counsel next asked Little if Jascha had ever gone to prison, and counsel for Chiaverini objected.

6

**Rogers**: Well, wait a second, Your Honor.

**Defense counsel Meyers**: Well, he made—

**Rogers**: My objection was to his question she had called police on him and not the situation. I said, you know, he has not been anywhere as we will get into[.] He's [not] been in jail since 1993.

**The Court**: Okay.

**Rogers**: He hasn't even had anything other than a drivers — I think improper license plate type of thing is the only even traffic offense that he's had since 1993.

**The Court**: What relevance does that have to this case?

**Meyers**: The relevance is ongoing unnecessary harassment/litigation of these events. Now counsel's willing to stipulate his client did six years in prison. I don't need to go any further.

**Rogers**: Objection, Your Honor. That was totally inadmissible. It was already in there improperly.

**The Court**: I'll instruct the jury to disregard this matter and I'll ask counsel to not go into the subject any further. Anything have [sic] to do with alleged criminal charges is not, in my view, relevant to this case. The fact there may be bad blood between the witness and her brother, that's another matter. But anything having to do with any criminal charges is not relevant to this case. I would instruct the jury to disregard that testimony.

Chiaverini contends that the above excerpts demonstrate that defense counsel was attempting to "circumvent the Federal Rules of Evidence, Rule 609."

Rule 609 states:

(a)    **General Rule** — *For the purpose of attacking the character for truthfulness of a witness*,

(1)    evidence that a witness . . . has been convicted of a crime . . . if the crime was punishable . . . in excess of one year . . . . shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused . . . .

(b)    **Time limit**. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

Fed. R. Evid. 609 (emphasis added).

7

Chiaverini fails to acknowledge that evidence regarding Jascha's time in prison was not introduced to attack his character or credibility. The jury was not told what crime Jascha committed, nor any of the facts surrounding his conviction. Rather, the jury simply heard references to the fact that Jascha had spent time in prison. None of those references appear to have been made to "attack his character for truthfulness." The fact that Jascha was not present at the pawn shop for six years because he was in prison, and that during that time his parents operated the pawn shop, was relevant to the factual dispute over who owned the shop before the bill of sale was executed.

Chiaverini contends that Brian Beneteau's testimony that Jascha told him in 2003 that "he had just gotten out of prison" when he had actually been released ten years earlier is so implausible that it demonstrates that defense counsel coached his witness to lie as a way to circumvent the Rules of Evidence. For support, Chiaverini points to *Sanders-El v. Wencewicz*, 987 F.2d 483, 484 (8th Cir. 1993), a case from the Eighth Circuit involving attorney misconduct. In *Sanders-El,* when defense counsel was cross-examining the plaintiff in a § 1983 case (alleging police brutality), he "dramatically dropped a lengthy computer printout in front of the jury." The computer printout was "about 10 feet of paper," and the Eighth Circuit found that "[t]he manifest intent of the conduct was to arouse the prejudices of the jury by leading it to believe Sanders-El had the conviction record of a veteran vocational criminal. Counsel conducted this piece of theatrics despite pretrial discussions in which the court indicated its intention not to admit such evidence." *Id*.

In the case at hand, it is pure conjecture that defense counsel coached Beneteau to inject perjured testimony attributing a statement to Jascha. There is no evidence that Beneteau was not giving truthful testimony; it is quite possible that Jascha did in fact tell Beneteau that he had been in prison, as a way of explaining the ownership and control of his pawn shop, and why he was

8

looking for items that he alleged were stolen by his mother years before. The district court properly denied Chiaverini's motion for a new trial on this basis.

Chiaverini also claims that defense counsel's statement that Jascha "spent six years in prison" during Gail Little's testimony constitutes misconduct. However, we defer to the trial court's assessment of the effect of the comment, specifically, that it had no effect on the jury.

Lastly, Chiaverini argues that defense counsel improperly elicited inadmissible testimony from Detective David Meyer. Chiaverini again asserts that this constituted misconduct on the part of defense counsel, and also argues that the district court incorrectly admitted this testimony over its objection.

After the close of Chiaverini's case, Frenchie's called Michigan State Police Officer David Meyer. Before he was able to testify, Chiaverini made an objection, which the district court overruled, stating that it would allow the testimony and "rule on objections as they come up." Meyer testified that he investigated whether Brian Beneteau's purchase of the items from Heams violated Michigan's Precious Metal Act. The investigation began in January 2006, and in March 2006, Meyer interviewed Jascha Chiaverini, his lawyer George Rogers, and Brian Beneteau. He also examined some transcripts from a civil proceeding that were provided by George Rogers. The following excerpt is the testimony that Chiaverini challenges as inadmissible:

> **Meyers** (defense counsel): Based on your investigation, did you ever determine who actually owned this property that was alleged to be stolen?
> **Off. Meyer**: No, I didn't.
> **Meyers**: I appreciate that you told us Mr. Chiaverini claimed that the property was stolen. Based on your investigation as an officer, did you ever determine whether or not even the property was actually ever stolen or not?
> **Off. Meyer**: No, I did not.
> **Rogers**: Objection, Your Honor.
> **The Court**: Counsel, what was the objection?

9

**Rogers**: You know, this witness has no personal knowledge of the facts, and in fact what he's doing is he's asked to be substitute [sic] for whatever information he has, is substitute his opinion for the jury in a criminal case, which has got a different standard of proof.

**Meyers**: I didn't ask—

**Rogers**: I mean, that's what in effect he's being asked for. He's being asked opinion based as an investigator, which would be basically we have a jury that's conducting an investigation with evidence and people under oath being brought to court, and pursuant to the rules of evidence, and so forth, that are brought in front of the Court, and I don't see where his investigation that he has no firsthand knowledge of would be relevant to the duty and the evaluation of the jury's—

**The Court**: What is your last question to the witness that you want him to answer? Counsel, would you restate your question again? What is it?

**Meyers**: My question to the officer was based on his investigation of the matter, did he as a police officer ever determine whether or not the property itself was stolen. I didn't ask him to make a judgment call on civil liability, criminal liability, or—I'm asking about an investigation instituted by Chiaverini.

**The Court**: Well, but are you asking him to state an opinion?

**Mr Meyers**: I'm asking for his opinion as a police officer of 29 years, having done thousands of investigations. Believe he can answer that.

**The Court**: Well, all right. Well, we'll take his opinion, then, at this point whether as result of his investigation he came to any conclusion. Admonish the jury that this is strictly an opinion, and the jury is free to disregard it if they wish. Go ahead.

**Mr. Meyers**: I'm going to ask it again, sir, based on your years of experience as a police officer and thousands of cases that you've done—

**The Court**: Would you just state your question please.

**Mr. Meyers**: Could you actually—did you make a determination as to whether or not the property was ever actually stolen?

**Off. Meyer**: I did not make a determination that it was stolen.

Even assuming, arguendo, that the testimony provided by Detective Meyer was inadmissible, there is no evidence of bad faith on the part of defense counsel, as Chiaverini contends. In addition, inadmissible evidence is not in itself grounds for a new trial. Rule 61 makes clear that "no error in admitting or excluding evidence . . . is ground for granting a new trial." Fed. R. Civ. P. 61. In order to be entitled to a new trial, the moving party must show that the trial was unfair, and that the proceedings were influenced by prejudice or bias. *Holmes*, 78 F.3d at 1046. The court made clear to the jury that Detective Meyer was simply expressing his opinions and that the jury was free to

disregard it. We see no reason to question the district court's determination that the testimony did not improperly impact the jury's determination of ownership, and there is no indication Detective Meyer's testimony resulted in an unfair or biased trial.

III.

Accordingly, we affirm the decision of the district court.